## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **NELDA COOPER,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **1:17-CV-00606-KOB** |
| **NANCY A. BERRYHILL,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On March 7, 2014, the claimant, Nelda Marie Cooper, filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. The claimant alleged disability commencing on September 27, 2013, because of bone spurs, herniated disks in her back, depression, stress, and anxiety. The Commissioner denied the claim on July 15, 2014. The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on November 16, 2015. (R. 32, 66-103).

In a decision dated February 25, 2016, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. On February 15, 2017, the Appeals Council denied the claimant's request for review. Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted her administrative remedies, and this court

has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner. (R. 1-5, 14-27).

## II. ISSUE PRESENTED

The claimant presents the following issues for review:

1.      whether the ALJ properly assessed the claimant's subjective complaints under the pain standard; and

2.      whether the ALJ accorded proper weight to the opinions of the claimant's consulting physician, Dr. Fava.

## III. STANDARD OF REVIEW

The standard of reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if he applied the correct legal standards and if substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual finding." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F. 2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from the condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Once the claimant establishes an impairment, the ALJ must consider all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms in deciding the issue of disability. *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). In addition to objective medical evidence, the ALJ will consider daily activities; the location, duration, frequency, and

intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; medication, treatments, and other measures used to alleviate pain or other symptoms; and functional limitations and restrictions caused by pain or other symptoms. *See* 20 C.F.R. § 404.1529 (c).

If the ALJ decides to discredit the claimant's testimony as to her pain or other symptoms, he must articulate explicit and adequate reasons for that decision. *Foote*, 67 F.3d at 1561-62. A reviewing court will not disturb a clearly articulated credibility finding with supporting substantial evidence in the record. *Id.* at 1562.

The Global Assessment Functioning Score (GAF) is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning. *Wesley v. Comm'r of Soc. Sec.*, No. 99–1226, 2000 WL 191664, at *3 (6th Cir. 2000). Failure to reference a GAF score is not, standing alone, sufficient ground to reverse a disability determination. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002). An assessment of a GAF score of 50 or below can indicate serious mental impairments in functioning. *McCloud v. Barnhart*, 166 F. App'x 410, 418 (11th Cir. 2006) (citing the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994)). For any GAF score in the medical record revealing possible serious mental impairments, the ALJ should determine what weight, if any, to give that particular score. *Id.* However, the GAF scale "does not have a direct correlation to the severity requirements in [the] mental disorders listings." *Nye v. Commissioner of Social Sec.*, 524 F. App'x 538 (11th Cir. 2013). Therefore, the ALJ is not required to rely on a GAF score in making his ultimate disability determination. *Luterman v. Commissioner*, 518 F. App'x 683, 690 (11th Cir. 2013).

Furthermore, the ALJ must state with particularity the weight he gave different medical opinions and the reasons therefore, and failure to do so is reversible error. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). The ALJ must consider all medical opinions, but does not have to give special deference to an opinion from a single consultation. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The Commissioner may reject any medical opinion if the evidence supports a contrary finding. *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985).

## V. FACTS

The claimant was fifty-seven years old at the time of the ALJ's decision. The claimant has a ninth grade education and has worked as a cook, caregiver, and housekeeper. The claimant alleges disability beginning on September 27, 2013, because of bone spurs, herniated disks in her back, depression, stress, and anxiety. (R. 14, 163, 204-09).

### *Physical Impairments*

The earliest report of the claimant's back pain in the record is dated June 30, 2005, when she visited Dr. Anne Davis at Talladega Internal Medicine for a pre-employment physical to work as a caregiver at Sunset Inn. Dr. Davis reported that the claimant had a herniated disk, suffered from lower back pain, but appeared to be able to work. On September 13, 2005, the claimant visited the Citizens Baptist Medical Center's emergency room because of back pain, and Dr. Radwan Mallah prescribed Lortab, Flexeril, and Voltaren to the claimant. (R. 268-76, 281).

The claimant returned to Dr. Davis on June 12, 2007 for another employment physical for Sunset Inn. The claimant reported back pain, primarily in her lumbar region. Dr. Davis stated that the claimant appeared "adequately suited" to work at Sunset Inn and prescribed Naproxen

for her back pain. The record does not contain medical notes about the claimant's back pain from June 13, 2007 to June 22, 2011. (R. 278-81).

The claimant attended a third employment physical for Sunset Inn on June 23, 2011, where she reported back pain and chronic dizziness. The claimant reported that she took Aleve for her back pain and Meclizine for dizziness. Her final physical was on February 13, 2012 and was for a new job at Gardens of Talladega. Dr. Davis reported that the claimant had no complaints and appeared to be physically fit and able to work. The record does not contain medical notes about the claimant's back pain from February 14, 2012 to January 3, 2014. (R.278-81).

On January 4, 2014, the claimant visited the Citizens Baptist Medical Center's emergency room for a wound to her left hand. After performing a physical examination on the claimant, Dr. Joseph Lester reported that the claimant had normal strength, reflexes, and range of motion in her neck and musculoskeletal regions. (R. 287).

On April 14, 2014, the claimant filled out a Function Report for the Social Security Administration. In the functional report, the claimant stated that she was able to work, lift, stand, walk, and clean before her disability, but could no longer perform those activities; her sleep was disrupted by pain and bad dreams; her personal care was unaffected by her impairments, except her arms and shoulders became tired when she brushed her hair; she cleaned the kitchen and did the laundry, but could not sweep or mop because of back pain; had trouble getting along with family and co-workers; did not engage in social activities; and could not lift more than thirty pounds, squat, bend, straighten up, or climb stairs. (R. 223-28).

On June 3, 2014, the claimant visited Dr. Anthony Fava at Family Medicine for a consultative examination at the Social Security Administration's request. The claimant reported

that she suffered from chronic back and leg pain; could not stand for over 20 minutes because of pain; had arthritis in her knees, which caused pain in her right hip; used over the counter ibuprofen; and did not take prescription medications because she could not afford a physician. Dr. Fava reported that the claimant had a normal range of motion in her upper and lower extremities; decreased range of motion in her back; no spasms or deformity in her back; no difficulty getting on and off the examination table; no evidence of ataxia or spasticity; and the ability to squat and arise, heel-to-toe walk, and ambulate normally without the use of an assistive device. (309-13).

Dr. Fava diagnosed the claimant with osteoarthritis, herniated nucleus pulposus of the lumbar spine, and bone spurs affecting the lumbar spine. Dr. Fava noted that the claimant could perform the following work related activities: sitting, walking, and standing for less than 20 minutes; lifting, carrying, and handling objects weighing less than three pounds; and hearing and speaking. He also noted that the claimant could not travel. (R. 309-13).

On July 10, 2014, at the request of the Social Security Administration, Dr. Chang Kon Jin x-rayed the claimant's lumbar spine at the Anniston Medical Clinic. Dr. Jin stated, "The x-ray of the lumbar spine showed spur formation at L2 and L1, especially the right side . . . but, there is no evidence of narrowing of the joint space or other significant abnormal finding." He also stated, "[T]he x-ray showed L2 upper and L3 upper anterior spur formation. There is no significant space narrowing, except for L4-L5 area with a little bit of narrowing by this view." Dr. Jin concluded that the claimant suffered from degenerative arthritis with spur formation. (R. 315).

On August 27, 2014, the claimant visited Quality of Life for an initial consultation because of back pain and depression. She reported to Dr. Dolores Victoria that her back pain was

a ten out of ten on the pain scale. Dr. Victoria noted that the claimant was distressed to the point of tears; experienced back spasms and moderate back pain when she moved; and requested stronger medication than Naproxen. Dr. Victoria prescribed the claimant Naproxen and Ultram for her back pain. (R. 325-28).

On March 12, 2015, the claimant returned to Quality of Life. She complained of chest and back pain, which she rated a five out of ten. Nurse Practitioner Ashleigh Sullivan reported that the claimant experienced tenderness and spasms in the lumbar spine region; bending, daily activities, extension, flexion, and twisting aggravated her pain; and rest relieved it. Nurse Practitioner Sullivan prescribed Diclofenac and Robaxin for the claimant's back pain instead of Naproxen and Ultram. On April 13, 2015, Nurse Practitioner Sullivan reported that the claimant's back pain had not changed since her last visit and that the claimant had not been taking the Robaxin and had just started taking the Diclofenac. During the claimant's physical exam, Nurse Practitioner Sullivan found that the claimant was normal in each category, including musculoskeletal. Nurse Practitioner Sullivan stated, "Visual overview of all four extremities is normal." (R. 330-47).

On April 26, 2015, the claimant visited Citizens Baptist Medical Center complaining of back pain after she slipped and fell at work. The claimant rated the pain an eight out of ten. Dr. Nilam Chiman Patel reported that the claimant's pain was moderate; that certain positions and movements aggravated it; and that the claimant experienced tenderness in her thoracic and lumbar back regions; but her range of motion in the musculoskeletal regions was normal. Dr. Patel x-rayed the claimant and found that there were multilevel degenerative changes with no acute process in the claimant's thoracic and lumbar regions. Dr. Patel prescribed the claimant Naproxen and Ultram for her back pain. (R. 369-78).

On November 12, 2015, the claimant followed up at Quality of Life for back pain that she rated a six out of ten. Nurse Practitioner Sullivan reported that the claimant's x-ray demonstrated disc disease and that she had muscle spasms and reduced range of motion in her back. Nurse Practitioner Sullivan noted that, although medication and rest relieved the claimant's pain, she was not taking the Diclofenac or Robaxin that Nurse Practitioner Sullivan prescribed. (R. 405-09).

*Mental Impairments*

On November 19, 2013, the claimant saw Dr. Smith at the Cheaha Mental Health Center because of depression and anxiety. Dr. Smith diagnosed the claimant with Major Depression Disorder and General Anxiety Disorder and assigned the claimant a GAF score of 55. (R. 304-05).

During the claimant's visit to Quality of Life on August 27, 2014, Dr. Victoria stated that the claimant had a suicidal overdose in 1994 and admitted that at the time of the consultation she was having suicidal thoughts, but had no plan to commit suicide. Dr. Victoria prescribed Buspirone for the claimant's anxiety and Celexa for her depression. On March 12, 2015, Nurse Practitioner Sullivan noted that the claimant was not taking either the Buspirone or the Celexa. (R. 325-28, 330-39).

In her Function Report, filled out on April 14, 2014, the claimant stated that she had trouble dealing with family and co-workers; did not engage in social activities; experienced memory and concentration problems; had trouble managing her temper; and did not like to be alone because she was paranoid. On July 11, 2014, Dr. Robert Estock performed a Mental Residual Functional Capacity Assessment on the claimant at the request of the Social Security Administration. Dr. Estock noted that the claimant could be expected to understand and

remember simple instructions and tasks, but may need help with more detailed instructions and tasks; tolerate ordinary work pressures, but should avoid excessive workloads and rapid changes; work with regular breaks and a slow pace, while maintaining a work pace consistent for the mental demands of competitive level work; interact with the public and co-workers, but was expected to engage in occasional conflict with co-workers; and adapt to gradual and infrequent changes. Dr. Estock did not treat or examine the claimant. (R. 78-80, 228-30).

On April 13, 2015, the claimant reported to Nurse Practitioner Sullivan that her depression made functioning difficult; she experienced depressed mood, difficulty concentrating, diminished interest and pleasure, and excessive worry and restlessness; and she had "just recently" begun taking the Celexa prescribed to her on August 27, 2014 and had not taken the Buspirone. Nurse Practitioner Sullivan assessed that the claimant had a GAF score of 43 indicating "serious symptoms OR any serious impairment in social, occupational, or school functioning." In the "Assessment/Plan" section, Nurse Practitioner Sullivan stated, "CELEXAN 20MG PO DAILY!!! Take meds Nelda." While meeting with the claimant on November 12, 2015, Nurse Sullivan reported that the claimant was still not taking the Celexa. (R. 304-05, 325-28, 340-47).

*The ALJ Hearing*

After the commissioner denied the claimant's request for disability insured benefits and supplemental security income, the claimant requested and received a hearing before an ALJ on November 16, 2015. At the hearing, the claimant's attorney stated that the claimant started working part-time in Piggly Wiggly's deli in December of 2013, after her alleged date of disability, but was fired in August of 2015 because of her decision to attend the ALJ's hearing on

November 16, 2015. The attorney also stated that the claimant's work in the deli was not considered substantial gainful activity, except for the second quarter of 2015.

The claimant testified that while at Piggly Wiggly she worked between six and a half to seven hours a day; stood for three hours at a time with no breaks; and lifted boxes that weighed over thirty pounds. Although the claimant usually worked twenty-six hours per week and had informed her boss that she could not work more than that because of back pain, some weeks she worked twenty-eight to twenty-nine hours. The claimant also testified that she had trouble dealing with customers, other employees and her supervisor. If her supervisor was too demanding, the claimant would walk away, do as she was told, and then go home. She stated, "I would just leave it alone." (R. 42-45, 51).

Next, the claimant testified about her pain and physical limitations. The claimant testified that she experienced sharp back pain in her lower back, which work aggravated and medication relieved; spent her off days at home lying down; relied on her son to complete chores; and drove five times a week with no restrictions. (R. 41, 48-51, 54-55).

Then, the complainant testified about her medication use and treatment history. The claimant testified that she was taking Celexa for depression, and Naproxen and muscle relaxers for back pain; her medications helped and she had no side effects; she had no surgeries, steroid injections, or physical therapy for her back pain; and she did not use a brace, splint, cane, or walker. She also testified that her doctors referred her to UAB to see an orthopedic surgeon, but at the time of the hearing, she had not visited UAB.  (R. 45-47, 56).

Lastly, the claimant testified about her mental impairments. She testified that she experienced moments of forgetfulness and had trouble maintaining concentration, understanding

information, and getting along with others. Therapy for her depression was helpful, but she quit attending after her therapist left. (R. 48, 52-53).

Vocational expert, Melissa Williamson, testified concerning the type and availability of jobs the claimant was able to perform. Ms. Williamson testified that the claimant's past relevant work was as a cook, classified as medium and skilled; a laundry worker III, classified as light and semi-skilled; and a home health aide, classified as medium and semi-skilled. (R. 59).

The ALJ asked Ms. Williamson to consider a hypothetical individual the same age, level of education, and experience as the claimant who could perform medium exertional work, and could occasionally climb ramps and stairs, but never ladders and scaffolds; could frequently stoop; could occasionally kneel, crouch, and crawl; should never be exposed to unprotected heights, dangerous tools, dangerous machinery, hazardous processes; should never operate commercial motor vehicles; would be limited to routine, repetitive tasks and simple work-related decisions; would be able to accept constructive, non-confrontational criticism; could work in small group settings; would be able to accept changes in a workplace setting if introduced gradually and infrequently; would not be able to perform assembly line work with a production rate pace, but could perform other goal-oriented work; and in addition to normal breaks, would be off task approximately five percent of an eight-hour work day in non-consecutive intervals. (R. 61-62).

Ms. Williamson testified that the individual could not perform any of the claimant's past relevant work, but could perform other work in the national economy at the medium exertional level. The individual could work as a hand packager, with 8,000 positions available in Alabama and 600,000 positions available in the national economy; an order filler, with 1,000 positions available in Alabama and 20,000 available in the national economy; and a washer, with 4,000

positions available in Alabama and 300,000 available in the national economy. Next, the ALJ asked Ms. Williamson if the hypothetical individual could perform any of the claimant's past relevant work at the light exertional level. Ms. Williamson testified that the individual could not. (R.62).

The claimant's attorney asked Ms. Williamson if an employer would allow a full-time worker to take breaks three times a day to lie down or recline. Ms. Williamson testified that employer would not tolerate such breaks. (R. 63).

*The ALJ's Decision*

On February 15, 2016, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant met the insured status requirements of the Social Security Act through December 31, 2018. The ALJ found that the claimant started working part-time from December 2013, which was after the alleged onset date of disability, until August 2015. The ALJ stated that only one quarter during that time exceeded the substantial gainful activity threshold and found that this work activity did not rise to the level of substantial gainful activity for the entire period at issue. (R. 19).

Next, the ALJ found that the claimant had severe impairments of major depressive disorder; generalized anxiety disorder; degenerative arthritis with spur formation at L1/2; and minimal narrowing at L4/5. The ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of a Listing. The ALJ stated that the claimant's degenerative arthritis failed to meet or medically equal Listing 1.04 because she had no evidence of compromise of a nerve root or spinal cord characterized by neuro-anatomic distribution of pain, limited range of motion of the spine and motor loss

accompanied by sensor or reflex loss, or positive straight-leg raise; no spinal arachnoiditis; or no lumbar spinal stenosis resulting in pseudoclaudication and an inability to ambulate. (R.20).

The ALJ also stated that the severity of the claimant's mental impairments, considered singly and in combination did not meet or medically equal the criteria Listings of 12.04 and 12.06. In making this finding, the ALJ considered whether the "paragraph B" criteria were satisfied and found that the claimant had no restrictions in daily living because the claimant reported no difficulties caused by mental health issues in her functional report; no issues grooming or cooking; and was able to work part time. The ALJ found that the claimant had mild difficulties in social functioning because of her trouble dealing with others and her discomfort from being in crowds. However, the ALJ stated that the claimant could shop for herself, had never been fired or laid-off, and never had a physical altercation with anyone. The ALJ found that the claimant had moderate difficulties with concentration, persistence and pace because of depression and anxiety and had never experienced episodes of decompensation of an extended nature. The ALJ concluded that, because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria was not satisfied. (R.20-21).

The ALJ also found that the "paragraph C" criteria was not satisfied because the claimant had no medically documented history of a chronic mental disorder of at least two years' duration that had caused more than a minimal limitation on the claimant's basic work-related activities or repeated episodes of decompensation of extended duration. (R. 21).

Next, the ALJ determined that the claimant has the residual functional capacity to perform medium work except that the claimant could occasionally climb ramps and stairs; could

never climb ladders or scaffolds; could frequently stoop and occasionally crouch, kneel, and crawl; should never be exposed to unprotected heights, dangerous machinery, dangerous tools, hazardous processes, or operate commercial motor vehicles; would be limited to routine and repetitive tasks and making simple work-related decisions; could accept constructive, non-confrontational criticism, work in small group settings, and accept gradual and infrequent changes in the work place; the claimant could not perform assembly line work with production rate pace, but could perform other goal-oriented work; and in addition to normal workday breaks, would be off-task five percent of an eight-hour workday in nonconsecutive intervals. (R. 22).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable symptoms could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. To support his decision, the ALJ first referenced the claimant's four physical examinations from June 2005, June 2007, June 2011, and February 2012, where Dr. Davis cleared the claimant to work. Next, the ALJ referenced medical notes from September 13, 2005 concerning the claimant's emergency room visit because of an injury to her hand and stated that the claimant was independent regarding her Activities of Daily Living; exhibited a normal mood and affect; had a decreased range of motion in her back secondary to pain, but did not have pedal edema of the extremities; had myofascial lumbar strain; was prescribed pain medication; and was physically well, although her hand was injured.  (R. 23).

The ALJ next referenced the claimant's visit to the emergency room on January 4, 2014, where the review of the claimant's systems and the range of motion in her back were normal. Then, the ALJ referenced the x-ray of the claimant's lumbar spine on July 10, 2014 that

demonstrated that she had degenerative arthritis at L1/L2, with no evidence of narrowing of the joint space or other significant abnormal findings in that area, and anterior spur formation in the L2 upper and L3 upper, with a "little bit" of joint space narrowing in the L4-L5 region. (R. 23).

The ALJ also referenced the claimant's visit to the emergency room on April 26, 2015, after she slipped and fell at work. The ALJ stated that the claimant described her pain as "moderate" and "aching." The ALJ also stated that the radiological imaging revealed disc space narrowing at L4-5 and L5-S1, with mild hypertrophic arthropathy, and no acute fracture or subluxation. The ALJ then noted the claimant's follow-up visit to Quality of Life on November 12, 2015, where Nurse Practitioner Sullivan reported that the claimant was not taking any of the three prescribed medications and had "moderate" issues with her lumbar spine, with the rest of her systems appearing normal (R. 23-24).

Next, the ALJ addressed the claimant's mental health issues. The ALJ stated that the claimant had generalized complaints of depression and anxiety, which were treated with prescriptions; had GAF scores in the mid-fifties, which are "indicative of no more than moderate limitations"; had normal psychiatric exams; was not under any psychiatric care at the time of the hearing; and had failed to take medication for her mental health issues as she was instructed. The ALJ found no evidence that the claimant has difficulty getting along with others and had been employed for most of the period that she claimed she was disabled. Furthermore, the ALJ stated that the claimant's employment required a substantial amount of interactions with others and no evidence existed that her supervisor reprimanded her for her failure to get along with others. (R. 24).

The ALJ then addressed the psychiatric portion of the Disability Determination Explanation by Dr. Robert Estock and the Consultative Examination Report by Dr. Anthony

Fava. The ALJ gave great weight to Dr. Estock's opinion because Dr. Estock gave the full benefit of the doubt to the claimant and determined that the claimant possessed moderate limitations caused by psychological factors, which was consistent with the medical evidence of record. (R. 24).

The ALJ gave little weight to Dr. Fava's consultative examination report because Dr. Fava assessed limitations inconsistent with the medical evidence and his own examination of the claimant. The ALJ referenced Dr. Fava's examination where the doctor noted that the claimant exhibited normal range of motion in her extremities; showed no spasms or deformity in the back; exhibited 4/5 strength; was able to get on and off the examination table with no difficulty; ambulated without the use of an assistive device; displayed no evidence of ataxia or spasticity; and was able to squat and arise and heel-to-toe walk. The ALJ stated that the physical examination showed nothing objectively wrong with the claimant, but Dr. Fava gave extreme limitations, such as, the claimant could sit, walk, and stand for twenty minutes, and was capable of lifting, carrying, and handling objects less than three pounds. The ALJ found no objective evidence to support these extreme limitations, and therefore, gave little weight to Dr. Fava's opinion. (R. 24).

Next, the ALJ addressed the claimant's recent work history at Piggly Wiggly. The ALJ stated that the claimant's work activity during the period that she claimed she was disabled weighs heavily against her credibility and that her steady employment over the two-year period does not support her assertion that she had trouble getting along with other employees and her supervisor. Furthermore, the ALJ stated that the claimant's work history in industries that require a lot of customer service and interaction with the public does not support that assertion. (R. 25).

Finally, the ALJ found that the claimant could not perform any of her past work, but could perform other jobs in the national economy, such as, hand packer, order filler, and washer. Therefore, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 26).

## IV. DISCUSSION

The claimant argues that the ALJ failed to adequately consider her testimony about the effects that her persistent pain and mental impairments had on her functional capabilities. To the contrary, this court disagrees and finds that the ALJ properly discredited the claimant's subjective complaints.

In discrediting the claimant's subjective testimony, the ALJ in this case articulated reasons for doing so and substantial evidence supports those reasons. *See Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). The ALJ concluded that although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of those symptoms were not fully consistent with the evidence. The ALJ articulated specific reasons for his findings and substantial evidence supports those reasons.

The ALJ first found that the claimant's alleged back pain caused by bone spurs and herniated disks was not fully consistent with the evidence. To support his finding, the ALJ referenced the objective medical evidence, which included, two x-rays of the claimant's back. The first x-ray from July 10, 2014 demonstrated no evidence of narrowing in the L1/L2 region and spur formation in the L2 upper and L3 upper, with only a "little bit" of joint space narrowing in the L4-L5 region. The second x-ray from April 26, 2015 demonstrated space narrowing and mild hypertrophic arthropathy with no acute fracture or subluxation.

The ALJ also referenced treatment notes from several medical sources to support his decision. He referenced Dr. Davis's four physical examinations of the claimant that occurred between 2005 and 2011, where Dr. Davis cleared the claimant to work; emergency room notes from 2005 that noted that the claimant was physically well; emergency room notes from January 4, 2014, where Dr. Lester stated that the claimant had normal strength, reflexes, and range of motion in her neck and musculoskeletal regions; and Nurse Practitioner Sullivan's statement from November 12, 2015 that, although the claimant had "moderate" issues with her lumbar spine, the rest of her systems were normal. (R. 23-24).

Furthermore, the ALJ referenced the claimant's medication and treatment history. The ALJ noted that doctors presented the claimant medications, but she did not take them as instructed, even though she testified that they helped her and did not cause any side effects. The ALJ also noted that the claimant had not undergone surgery, received steroid injections, or participated in physical therapy for her back pain. (22-24).

The ALJ also relied on the claimant's daily activities and work history in making his decision. He cited the claimant's testimony that she had no problems with personal care and grooming, except her arms get tired when she brushed her hair; could prepare meals and perform chores; and had a steady work-history for two years following her alleged onset date of disability. (R. 25).

The court finds that substantial evidence supports the ALJ's determination that the claimant's complaints of severe back pain were inconsistent with other evidence in the record. Consequently, the ALJ properly discredited those subjective complaints.

The ALJ also articulated specific reasons supported by substantial evidence why subjective testimony regarding the claimant's functional limitations caused by her mental health

issues were not fully consistent with the evidence. The ALJ referenced treatment notes from 2014 to 2015 regarding the claimant's back pain, which showed normal psychiatric exams; the fact that the claimant was not under any psychiatric care at the time of the hearing; her GAF score of 55 from November 19, 2013 showing moderate limitations; the lack of evidence that she had trouble getting along with others; the lack of evidence that she was reprimanded for her inability to get along with others; the fact that she was employed in work that required substantial interactions with the public and coworkers; her failure to take prescribed medications as instructed, even though she testified that they helped her and did not cause side effects; and the claimant's functional report, which the ALJ states does not mention difficulties caused by mental impairments. (R.20-22, 24).

The claimant argues that the ALJ failed to consider the totality of the evidence that supports the claimant's testimony because he failed to reference the claimant's most recent GAF score of 43 from April 13, 2015. He also failed to mention that on that same visit the claimant reported suicidal thoughts, with no plan in place to commit suicide.

Although, the ALJ failed to mention the claimant's GAF score of 43, which indicates "serious symptoms OR any serious impairment in social, occupational, or school functioning," his failure to reference a GAF score is not, standing alone, sufficient grounds to reverse a disability determination. *See Howard,* 276 F.3d at 241 ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."). The ALJ articulated specific reasons supported by substantial evidence to support his decision that the claimant's functional limitations caused by her mental impairments were not as severe as she alleged, including, examples of the claimant's daily activities, social interactions, employment history, treatment notes, and medication use. (R.24).

This court finds that substantial evidence supports the ALJ's determination that the claimant's complaints of functional limitations caused by her mental health issues were inconsistent with other evidence in the record. Consequently, the ALJ properly discredited those subjective complaints.

*Issue 2: The ALJ's Assessment of the Consulting Physician's Opinion*

The claimant argues that the ALJ gave insufficient weight to Dr. Fava's statement that the claimant could sit, walk, and stand for less than 20 minutes and could lift, carry, and handle objects weighing less than three pounds. To the contrary, this court finds that the ALJ properly articulated his reasons for discrediting the opinion of Dr. Fava and that substantial evidence supported these reasons.

The ALJ may reject any medical opinion if the evidence supports a contrary finding. *See Sryock,* 764 F.2d 834, 835. The ALJ gave specific reasons why the evidence did not support Dr. Fava's opinion that the claimant could sit, walk, and stand for less than 20 minutes and could lift, carry, and handle objects weighing less than three pounds. The ALJ referenced Dr. Fava's statements that the claimant had a reduced range of motion in her cervical and dorsolumbar spine; normal range of motion in her upper and lower extremities; no spasms or deformity in her back; the ability to ambulate without an assistive device; no evidence of ataxia and spasticity; and the ability to get on and off the examination table, squat and arise, and heel-to-toe walk without difficulty.

Substantial evidence supports the ALJ's conclusion that the evidence from Dr. Fava's physical examination of the claimant was inconsistent with Dr. Fava's opinion. In Dr. Fava's examination notes, he reported that that the claimant's range of motion in her back was reduced, but that finding alone does not support the functional limitations he assessed. According to Dr.

Fava's own examination notes, the claimant had a normal range of motion in her upper and lower extremities; did not demonstrate spasms, deformity, ataxia, or spasticity in her back; and completed physical tests without difficulty. Other evidence in the record shows that during the claimant's visit with Dr. Fava in June 2014, she worked approximately twenty-six hours per week; stood for periods of three hours at a time; and lifted boxes over thirty pounds. (R. 42-45). This evidence contradicts Dr. Fava's opinion that the claimant could sit, walk, and stand for less than twenty minutes and lift, handle, and carry less than three pounds. Therefore, the court finds that the ALJ correctly gave Dr. Fava's opinion little weight and substantial evidence supports that finding.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the ALJ applied proper legal standards and substantial evidence supports his decision. Accordingly, this court AFFIRMS the decision of the Commissioner.

The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 21st day of September, 2018.

*Karon O. Bowdre*

**KARON OWEN BOWDRE**
CHIEF UNITED STATES DISTRICT JUDGE